Honourable judges, counsel, I believe on the one-year issue with respect to jurisdiction over the timeliness aspect of the asylum claim, since the government's letter of April 30, 2008, the only remaining issue on jurisdiction there is whether the court is applying undisputed historical facts to a governing legal standard or principle. I believe all facts in this case, whether historical or otherwise, are undisputed because there was no adverse credibility finding in this case. So everything the petitioner said in her testimony must be taken as true. The legal standards that we're addressing in this case are Section 208A2D of the Immigration and Nationality Act, which governs the changed circumstances exception to the one-year filing bar. The overriding evidentiary principle in immigration courts that evidence should be judged for probativeness and fundamental fairness as opposed to hearsay, and also the injection of this hearsay principle into the one-year issue, which then bled over to the withholding claim. Your Honours, if the immigration judge is allowed to do what he did in terms of his hearsay approach on this changed circumstance issue, he will eviscerate Section 208A2D of the Act. Think about it. Inherent in changed circumstances is hearsay. The alien is over here, and the changed circumstances are taking place in the country of persecution. Those circumstances must be communicated in some fashion to the alien who is going to be here by a person who probably might not even be alive at the time the case comes to trial. Now, I think I'm correct. You can correct me if I'm wrong. I think that hearsay is admitted in immigration hearings even outside of the changed circumstances context, and it may be hearsay and therefore get less weight, but I think it's admissible. I think hearsay is admissible. Absolutely. And here's what the immigration judge did in this case. The immigration judge categorized the evidence as hearsay and then diminished it to the extent that it was worthless. He also failed, Judge Noonan, to take into account the social and cultural milieu from which the petitioner comes from, as in Montesino v. INS. In this situation, the communicator of the changed circumstances was the father of the petitioner and an elder of the subclan. In that context, the elder of the subclan in an intra-faction dispute within the clan, the Mungiki Christians versus the non-Mungiki faction, this elder would be in a position to know these things and communicate them to his daughter. And, Your Honor, it's just an end run around the exclusionary rule in hearsay that was done here. Counsel for the government says, well, you know, it wasn't really hearsay because the exclusionary rule wasn't applied. But the evidence was diminished to such an extent that no applicant, even if the information communicated to the applicant by her dad had been communicated to a newspaper that published this information, this evidence would have been discounted. Your Honors, I want to move quickly to material factual error in this case. There are a few items that I want to touch on. The immigration judge said there was no harm directed at the petitioner. This is false. The petitioner testified at page 86 and 99 of the transcript that the Mungiki intended to kill her. This was what was communicated to the petitioner. So the fact that he says there was no harm directed to her is false. Remember also who the Mungiki are. The Mungiki are a group who inherent in their philosophy is the circumcision of women, of their female victims. She said she feared circumcision in this case. The immigration judge said that for some reason the petitioner wished to file an affidavit against the Mungiki. This showed a real disregard for the facts. It wasn't that she had decided for some reason to file an affidavit. The facts of the case show that she was dragged into this dispute by her Uncle David on the non-Mungiki Christian side of the clan. Uncle David said she's here in America, away from Mungiki influence and aggression. And if this aggression by the Mungiki faction continues, she will file an affidavit about what she knew about her brother's death. The Mungiki threatened to kill her at that point. So it wasn't that she was wanting to file an affidavit. Your Honor, the immigration judge said that she knew nothing of the facts of her brother's situation in Kenya. This is not true. The facts of that situation were communicated by her dad to her. Cousin Paul, remember, was a Mungiki member who knew about the plot to kill her brother in Kenya. These things were communicated to the father, the elder, who communicated them to his daughter. Your Honor, this judge could not have fairly adjudicated this claim with that misunderstanding of the facts. I'd like to move now to categorization. Categorization in an asylum claim and a withholding claim is identical. Race, religion, national origin, membership in a particular social group or political opinion. You miscategorize for one, you're going to miscategorize for the other. Now, this applicant said that she was afraid of FGM. She said that at pages 21, 109, 272, and I covered it in 127 of the administrative record. You will find no evaluation of female genital mutilation as it relates to this woman. And certainly, more troublingly, you will find no reference to it in any of the government's papers. Kinship, Your Honors. There's a long history of cases in this circuit that say that kinship may qualify for asylum in the social group of asylum cases. Remember, she was the representative, the avenging expatriate member of the non-conforming group. The non-Mungiki Christian faction of that clan here in America against the Mungiki faction. She was immutably linked to that faction of her clan and would be persecuted. You just have no ability to review this kinship matter because the Board of Immigration Appeals and the immigration judge made no mention of it. Only after all of this error do we come to evidentiary confusion. The evidentiary confusion was manifest in the immigration judge's quest for absolute trustworthiness and of the testimony. And this poisoned the entire case. It is with this mindset and context that the hearsay principle was injected into this hearing. Now, the government quarrels with burdens of proof. I made the point that the clear and convincing evidence standard was wrongfully applied to the withholding case. And the government says, well, that wasn't exhausted administratively. I think it was, Your Honors. I cited it in my BIA brief. I referenced 8 CFR 208.18, which gives the correct evidentiary standard for withholding. And I discussed the overarching quest, evidentiary quest for certainty, which was inappropriate with regard to hearsay in this case. Most importantly, though, the government says, well, hearsay was only used for weight and not for admissibility. If that's the case, Your Honor, then you have jurisdiction, whether or not administratively exhausted, to judge all evidentiary standards which were applied to that weighing process. And you will see that in that weighing process, there was absolute confusion. Even at page 3 of the transcript, the Board of Immigration Appeals got it wrong, applying the clear and convincing standard to 208A2D, which carries the lowest absolute burden of proof in all of immigration law, and that is to the satisfaction of the Attorney General's standard. What, if anything, does Ramadan tell us? Does it educate us as to how that standard is to be applied? What does our recent decision on Ramadan tell us in terms of how that standard is to be applied? Anything? I believe that the Ramadan case doesn't say much about how the standard is to apply, but I believe that the Sajedek case, if I'm getting that right, Sajedek v. Gonzales, does say that the immigration judge has to understand the section 208A2D. It says that this immigration judge needs to understand the statute and what it stands for. The facts of that case were a little bit different, but the record of this case shows a manifest lack of understanding of Section 208A2D on the part of the immigration judge. Your Honors, if I have any time left, I'd like to reserve it for rebuttal. Well, you've used up all the time, but what we'd like to do is let's hear from the government, and then we'll give you a minute to respond. Thank you so much, Your Honors. Good afternoon. Your Honor, I'm being... Could you please state your name for the record? Oh, yes, Your Honor. I'm sorry. Michael J. Mulaney from the Department of Justice. Your Honor, the decision of the Review Board and the IG should be affirmed by the Court. There is no question in this case that the asylum application was late. So the question turns on were there sufficient changed circumstances to allow for the immigration judge or the Board of Immigration Review to find that asylum was proper. And in fact, there's not. There's been much said about the hearsay question. There is no question whatsoever that the immigration judge accepted the hearsay statements as evidence. Twice. I'd like to start on the sense where we finished up. What's your response to the argument that the BIA applied the wrong legal standard? I don't believe they did apply the wrong legal standard, and the reason you have to is when you go back to the underlying facts, and I believe you do have to go back to this hearsay argument. In fact, you know, in order for withholding, for there to have been a withholding, there must be a clear probability that it's more likely than not that the petitioner would suffer persecution if she were to return to Kenya. Under asylum, she has to show a well-founded fear of returning to Kenya. The issue here turns out upon what were the facts that were presented to the immigration judge, and thus to the Board of Immigration Review. Let me be more specific with my question. I'm on page 3 of the administrative record. It's the second page of the Board's order. There's a run-over paragraph that begins on the previous page. At the end of that paragraph, it's basically at the top of page 2 of the order, page 3 of the AR, the BIA writes, No, Your Honor. I'm not. I thought you just told me that it was. No, I didn't tell you that it was the correct standard, but I am telling you that Well, if they misapplied the standard, why don't you confess error and we'll take it and send it back? Because under the facts here, the court could not have even found a preponderance. What's that? Under the facts here, the court could not have even found a preponderance. No, but the Board got the standard wrong. You agree with us. It's wrong. It has to go back and do it over again. It's like a child being sent back to do its homework. It got it wrong. Don't you agree? I agree that that statement is incorrect. Well, that was what they were doing. But I don't believe so. Well, why not? They say they're doing it. Why don't you believe it? Because I believe you have to look at the entire record of what occurred. When you ignore what they say they're doing, then we're supposed to do some other exercise. I believe, again, if you look at the entire record of what occurred, while they make the same statement that the immigration judge makes, what is very clear from the immigration judge's decision is that he found no evidence whatsoever that supported the idea that. . . But, of course, what the I.J. finds and considers evidence is never going to be binding on the BIA. Once it does this, it's evaluating the evidence its own self. And you're saying, on the one hand, they applied the wrong standard. And then you're saying, and the evidence is so overwhelmingly in favor of your side that even if they had applied a different standard, they would have come to the same result. I don't think we can do that. That is to say, we're required in various ways, under threat of all kinds of bad things, to send things back now under Ventura. Usually Ventura works to your advantage. This time I think it works to your disadvantage, but I think it's the same deal. Am I wrong? The main reason, you're not. . . I can't say you're wrong, obviously. Clearly, they said clear and convincing. But, again, I think. . . But, specifically, I'm interested in right or wrong as to, doesn't Ventura require that we send it back to the BIA so that we can get its view of the evidence rather than our view of what they would have decided if viewing the evidence under the proper standard? But I think you can see what they would have decided by the statements of their own opinion. We have been rebuked pretty clearly in earlier cases, Ventura included, for concluding that we know what they would have decided. I'm finished with saying I know what they would have decided because I've been instructed I'm not supposed to say that. Well, then, very well, Your Honor. Does that mean that's the end of it? Do we have to send it back? Your Honor, again, I think that despite Ventura, the clear import of the BIA's decision and the immigration judge's was that there was no sufficient evidence provided to show any change in circumstances here, that the story that was told, that even when you got through the end, even accepting everything. Why do you go on arguing? You've conceded you're wrong. You can just sit down. You're not compelled to go on and talk just for the sake of talk. Very well, Your Honor. I'll take my seat. Thank you. Any response? Your Honor, I will submit on the arguments. Okay. Thank you. Thank you very much. I appreciate both of you coming in today. The case of, and I'm still I'm not sure I'm pronouncing it correctly, Metta May v. McKasey is now submitted for decision. Thank you.
judges: Noonan, Fletcher, Gould